IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JESUS ACOSTA | : | CIVIL ACTION |
| | : | |
| v. | : | No. 14-1859 |
| | : | |
| EAST PENN MANUFACTURING COMPANY, INC., et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.** **September 30, 2015**

Defendant East Penn Manufacturing Company (East Penn) seeks summary judgment as to pro se Plaintiff Jesus Acosta's claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Acosta, a black male, alleges he was subjected to a hostile work environment during his approximately five-month tenure with East Penn and was fired in retaliation for complaining to his supervisors about racial remarks and workplace bullying. Because Acosta has failed to point to evidence in the record that would allow a reasonable juror to find in his favor on either claim, East Penn's motion will be granted.

**FACTS**[1]

In January 2012, Acosta applied for a job with East Penn, a manufacturer of batteries and related products.[2] Snyder Aff. ¶ 2 & Ex. A. On June 4, 2012, East Penn hired Acosta for a full-

[1] The following facts are drawn from the evidence in the summary judgment record, which the Court views in the light most favorable to Acosta, drawing all reasonable inferences in his favor. *See Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[2] Prior to joining East Penn, Acosta worked for Ashley Furniture for a period of several months in 2011. *See* Snyder Aff. Ex. A. Although Acosta was fired from his position at Ashley, *see* Def.'s Ex. 5, he did not disclose the termination on his application for employment with East Penn, but instead stated he left Ashley to "[p]ursu[e] . . . a job that was financially better," Snyder Aff. Ex. A. Acosta maintains he was subjected to discriminatory and abusive treatment by his supervisor at Ashley and was fired for reporting the supervisor to the human resources department. *See* Acosta Dep. 10-11, 14-21; Pl.'s Exs., ECF No. 30.

time position as a battery manufacturer trainee (BMT). *Id.* ¶ 5. As part of his orientation, Acosta received copies of all of East Penn's personnel policies, including the company's Code of Conduct, and also received training on those policies. *See id.* ¶ 6 & Ex. D.

As a newly hired employee, Acosta was subject to a 180-day introductory period before becoming eligible for regular employment with East Penn. During the introductory period, East Penn evaluates an employee's attendance, quality of work, safety, ability to meet production requirements, job knowledge, and teamwork at regular intervals. *See id.* ¶ 8 & Ex. F. Generally, an employee will be transitioned to regular employment at the conclusion of the introductory period if he has demonstrated satisfactory attendance, consistently met production requirements, consistently met quality and safety expectations, become qualified for his job, including successful completion of the appropriate training forms, and not violated the company's Code of Conduct. *See id.* Ex. F. Acosta acknowledged in writing that he received information about and agreed to comply with the requirements of the introductory period. *See id.*

Acosta was initially assigned to train as a laminator in the glass mat department in Plant A-1 on the first shift, the shift on which all BMT training takes place. Thomas Aff. ¶ 2. Acosta first trained with Denise Reinert, a regular full-time employee in the department. Acosta Dep. 159; *see* Thomas Aff. ¶ 2. At some point, Acosta began training with Duane Jenne, another regular full-time employee in the department, because Reinert was not training him properly.[3] Acosta Dep. 131-32, 159-60; *see* Thomas Aff. ¶ 2. Acosta does not contend any improper training he received was because of his race. *See* Acosta Dep. 132 ("I never said anything about . . . Denise being racist towards me.").

[3] East Penn denies that Acosta ever switched trainers because he was not being trained properly, asserting Acosta was at all times trained by both Reinert and Jenne. Thomas Aff. ¶ 2.

During Acosta's training, Donald Thomas, the first-shift foreperson in Plant A-1, was responsible for supervising BMTs. Thomas Aff. ¶ 1. As part of his supervisory responsibility, Thomas visited BMTs in the glass mat department and their trainers daily to check on the BMTs' progress. *See id.* ¶ 2. Thomas characterized the laminator position as one of the easiest production jobs to learn at East Penn, *see id.*, and described the responsibilities of the job as follows:

> Normally there are two laminating machines operating during each shift, with two operators on each machine. The machines take an envelope or separator paper and apply glue to the ribs of the paper. The paper then goes through rollers where fiberglass is applied to the glue-covered surface of the paper. One operator is responsible for watching the machine as the glue is applied. The other operator watches what comes through the machine and inspects for product quality. The end product is round-shaped and can vary based on product type from 1000 to 2400 feet long. At that point both operators work together to package the rolls.

*Id.* ¶ 3. On June 27, 2012, during Acosta's fourth week of training, Thomas gave Acosta a verbal warning that he needed to move faster and pay more attention to the laminating machine. *Id.* ¶ 4 & Ex. A. The warning was based on feedback Thomas received from Acosta's trainers. *Id.* ¶ 4.

After completing the training requirements for the glass mat operator position in June and July 2012, Acosta was assigned to work on the second shift in the glass mat department. *See* Snyder Aff. ¶ 9 & Ex. G; Santerelli Aff. ¶ 3. Jeffrey Santerelli, who held a Leader position in Plant A-1, directly supervised second-shift employees in the glass mat department, including Acosta. Santerelli Aff. ¶ 1. Eric Yocum, who was then the Assistant Plant Manager in Plant A-1, also supervised the glass mat department on the second shift, though Yocum did not directly supervise employees in the department. Yocum Aff. ¶ 1.

On July 12, 2012, Santerelli met with Acosta and spoke to him about his poor work performance. Santerelli Aff. ¶ 4. Based on complaints he received from Acosta's coworkers, Santerelli documented that Acosta was having problems learning and performing all aspects of his job and was displaying poor and careless work habits that resulted in the production of unusable separator material. *See id.* ¶ 4 & Ex. B.

Following his meeting with Santerelli on July 12, 2012, Acosta's performance issues persisted. According to Santerelli, Acosta was responsible for improperly gluing separator material on July 18, 2012, was partially responsible for causing over 5,000 feet of separator material to be scrapped on July 24, 2012, and was partially responsible for improperly gluing material to the separator paper on August 21, 2012. *Id.* ¶¶ 5-7 & Exs. C-E.

Acosta does not dispute that there were instances during his shifts when material had to be scrapped because it was glued improperly, but he maintains the problems stemmed from Thomas's instruction that the shims be taken out of the laminator machines. *See* Acosta Dep. 87-91, 106-07. Although this change in work method applied to everyone in the department, Acosta does not know whether (and has produced no evidence suggesting) any of his coworkers had similar problems in terms of producing scrap. *See id.* at 107.

In late August or early September 2012, Santerelli met with Acosta to discuss a complaint Santerelli received from Barry LaFaver, one of Acosta's coworkers, concerning Acosta's job performance.[4] Santerelli Aff. ¶ 8. LaFaver complained to Santerelli that it was

---

[4] In his Affidavit, Santerelli states he met with Acosta on August 22, 2012, Santerelli Aff. ¶ 8; however, the supervisor documentation sheet Santerelli completed regarding LaFaver's complaint appears to be dated August 27, 2012, *id.* Ex. F. Acosta recalled meeting with Santerelli in either late August or early September 2012. Acosta Dep. 149-50. Any discrepancy regarding the date Santerelli met with Acosta is immaterial to the resolution of East Penn's summary judgment motion.

becoming difficult to work with Acosta because Acosta was continually allowing the glue tray to run empty and did not remember essential aspects of his job, yet still had time to do sit-ups and push-ups at work. *Id.* Ex. F. Santerelli received similar complaints about Acosta from other coworkers around the same time, including complaints that Acosta had poor job knowledge and was constantly letting the glue tray run empty while doing push-ups and sit-ups during work time. *Id.* ¶ 8. According to Acosta, the day before Santerelli came to see him, LaFaver had told Acosta he was going to make sure Acosta was written up. Acosta Dep. 83.

During the meeting, at which Jason Huey, the Plant Manager for the A-1 Plant,[5] was also present, Santerelli told Acosta about the complaints he had received about Acosta's job performance. Acosta Dep. 81-82, 85. Acosta agreed he deserved to get written up for the push-ups and sit-ups—i.e., engaging in horseplay—but felt the criticism about allowing the glue tray to run out, which Santerelli had heard from several of Acosta's coworkers, was unfair. *Id.* at 81-82. After hearing LaFaver's criticisms, Acosta complained to Santerelli and Huey that LaFaver had been making inappropriate comments. *Id.* at 81-82, 85-86. He did not, however, disclose the content of the comments he found objectionable.[6] Acosta Dep. 81-82, 85-86; *see also id.* at

[5] Huey was the Plant Manager for the A-1 Plant until September 2012, when he left to manage the A-3 Plant. Santerelli Aff. ¶ 2. After Huey's departure, Eric Yocum took over as Plant Manager for the A-1 Plant. *Id.* Although some of Acosta's pleadings reference Huey's move, Acosta confirmed at his deposition he is not alleging Huey did anything wrong. *See* Acosta Dep. 162.

[6] At his deposition, Acosta testified LaFaver had made three derogatory comments about Puerto Ricans. First, in response to a question from Acosta about a noticeable scar on LaFaver's neck, LaFaver initially told Acosta a "bunch of Puerto Ricans" had slit his throat. Acosta Dep. 75-76. A half-hour later, LaFaver disclosed the scar was actually from cancer. *Id.* at 77-78. Another time, during a discussion about an East Penn employee who had been stabbed in the parking lot, LaFaver commented, "I bet it was a bunch of Puerto Ricans that did it." *Id.* at 78. On a third occasion, LaFaver stated the problem with Reading was that there were so many Puerto Ricans. *Id.* at 80. Acosta testified LaFaver had also said some good things about Puerto Ricans, including complimenting Puerto Rican cooking. *See id.* at 79. Acosta believes LaFaver has

141 ("I reported workplace bullying and racial remarks to Jason Huey and—I said inappropriate comments.").[7]

Upon hearing Acosta's complaint about LaFaver's inappropriate comments, Huey instructed Santerelli to correct the behavior. Acosta Dep. 86; *see also id.* at 93 (stating Huey told Santerelli "to go and tell them to knock it off"). Santerelli immediately met with the employees working in the glass mat department and told the group to "cut it out" or "knock it off," or words to that effect. *Id.* at 86, 94-95, 136. Santerelli recalled the gist of what he told the group was to stop using offensive language. Santerelli Aff. ¶ 8. According to Acosta, however, at the same time Santerelli was telling the group to knock it off, he was winking at them, conveying they need not take him seriously. Acosta Dep. 86, 94-96.[8] Acosta also asserts Santerelli did not document either Acosta's complaint about LaFaver or Santerelli's response to it. *See* Acosta Dep. 97-98. Nevertheless, after Santerelli spoke to the group, neither LaFaver nor anyone else made any negative comments about Puerto Ricans or African Americans. *Id.* at 96-97, 137.

A few weeks later, on September 18, 2012, Santerelli again met with Acosta to review his job performance during the first 90 days of his introductory period, a standard practice for BMTs. Santerelli Aff. ¶ 9; *see also* Snyder Aff. Ex. F (stating evaluations are completed after an

---

unresolved issues with people of Puerto Rican or Hispanic descent because LaFaver's wife left him for a Hispanic person. *Id.* Although Acosta explained the details of LaFaver's comments at his deposition, he admitted he did not convey the substance of the comments to Santerelli and Huey, but said only that LaFaver had made "inappropriate comments." *See id.* at 81 (denying having complained about inappropriate comments "about Puerto Ricans" and stating he told Huey about "inappropriate comments" but "didn't get into details"); *see also id.* at 82, 85-86, 141. Santerelli claims Acosta complained to him that LaFaver was "using foul language," but "never mentioned that LaFaver was making racial comments." Santerelli Aff. ¶ 8.

[7] Although Acosta also alleges Eric Yocum, the Assistant Plant Manager, subjected him to workplace bullying by spreading rumors about a conviction Acosta incurred as a juvenile, Acosta did not mention Yocum's bullying to Santerelli and Huey. *See* Acosta Dep. 99-101, 138-41.

[8] Santerelli denies winking. Santerelli Aff. ¶ 8.

employee's first 90 working days during the introductory period). Santerelli told Acosta he was showing little to no improvement in his job knowledge and performance, his progress and development were far behind where they should be, and the quality of his work was not meeting expectations. Santerelli Aff. ¶ 9 & Ex. G. Santerelli also told Acosta he could not recommend that Acosta be transitioned from BMT status to regular full-time employment unless Acosta showed significant improvement. *Id.*

Despite Santerelli's warning, Acosta's job performance did not improve. On October 22, 2012, while Acosta was responsible for the glue side of the laminator machine, approximately 3,100 feet of separator material had to be scrapped because there was little to no glue on the ribs and the fiberglass was misaligned. *See id.* ¶ 10 & Ex. H. According to Santerelli, Acosta was responsible for this improperly produced material that had to be scrapped, and none of Acosta's coworkers in the glass mat department produced anywhere near the amount of scrap separator material that Acosta was producing. *Id.* ¶ 10. On October 25, 2012, moreover, Acosta created a manifest to the wrong work order, causing the inclusion of inaccurate information in the inventory system, something he had done on other occasions. *See id.* ¶ 11 & Ex. I.[9]

After this series of errors, Santerelli and Yocum conducted a review and evaluation of Acosta's employment status and concluded he had failed to show improvement in multiple areas of his job performance. *See* Santerelli Aff. ¶ 12; Yocum Aff. ¶ 11. Based on Acosta's poor work performance in what Santerelli regarded as one of the easiest jobs at East Penn, and believing Acosta was not taking his supervisors' warnings seriously and did not seem to care about the job, Santerelli and Yocum decided to recommend Acosta's employment be terminated.

---

9 Acosta admits he made an error with respect to a work order or manifest on two different occasions. *See* Acosta Dep. 123.

Santerelli Aff. ¶ 12; Yocum Aff. ¶ 11. Pursuant to East Penn's standard practice, Santerelli and Yocum reviewed their recommendation with Anthony DiBenedetto, the Personnel Coordinator for Plant A-1, who agreed with the recommendation based on Acosta's failure to show improvement in multiple areas of his job performance. *See* Santerelli Aff. ¶ 13; Yocum Aff. ¶ 12; DiBenedetto Aff. ¶¶ 2-3. DiBenedetto then discussed the recommendation and reviewed Acosta's personnel file with Alison Snyder, East Penn's Personnel Director, who generally makes the final decision on all employee terminations at East Penn. *See* DiBenedetto Aff. ¶ 3; Snyder Aff. ¶ 11. After reviewing Acosta's file, Snyder was satisfied there were legitimate performance-based reasons for Acosta's termination and approved the decision to terminate Acosta. *See* Snyder Aff. ¶ 11.

On October 31, 2012, Santerelli, Yocum, and DiBenedetto met with Acosta and explained he was not demonstrating the required effort in his position and had not improved his work habits after receiving multiple documented warnings, which were reviewed with him at the meeting. Santerelli Aff. ¶ 14; Yocum Aff. ¶ 13; DiBenedetto Aff. ¶ 4; *see also* Acosta Dep. 125, 128 (agreeing Santerelli, Yocum, and DiBenedetto showed him supervisor documentation forms during the meeting and mentioned Acosta's recent write-ups). During the meeting, Acosta was informed his employment with East Penn was being terminated due to his poor work performance and unsuccessful completion of his introductory period. Santerelli Aff. ¶ 14; Yocum Aff. ¶ 13; DiBenedetto Aff. ¶ 4. Acosta protested, claiming Santerelli had previously told Acosta in private that he was doing a good job. *See* Acosta Dep. 125-26. Santerelli, however, explained Acosta was being fired for the times he got in trouble. *See id.* at 127-28.

In May 2013, Acosta filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging he was subjected to racial discrimination and

retaliation during his employment with East Penn. In the body of the charge, Acosta asserted he had complained to Huey in September 2012 about "workplace bullying/racial remarks" directed at him by his coworkers; Santerelli thereafter "corrected the behavior," and no more harassing comments were directed at Acosta; and Acosta was ultimately discharged on October 31, 2012, in "retaliation for complaining about discrimination." Defs.' Partial Mot. to Dismiss Compl. Ex. A, ECF No. 7-2. The EEOC issued a notice of right to sue on March 4, 2014, and Acosta initiated this pro se employment discrimination action approximately three weeks later, naming East Penn, Huey, Santerelli, and Yocum as Defendants. The Complaint in this action tracks the allegations in Acosta's EEOC Charge, and the "Facts" section of the Complaint reads, in its entirety, as follows:

> I am black, I was hired at East Penn in May of 2012 as a glass mat operator. I was hired for second shift, but I began training on first shift. During my employment I had to switch trainers because I was not receiving the correct training. I complained of racial remarks and work-place bullying to Jeff Santer[e]lli and Jason Huey in August 2012. Mr. Santer[e]lli corrected the behavior and no more remarks continued. On October 30, 2012[10] I was fired from my position as a result of reporting racial remarks and work place bullying on the job. I claimed that East Penn violated my Civil Rights.

Compl. 3, ECF No. 3. Acosta seeks $75,000 in damages for "wrongful termination and mental anguish," reinstatement to his prior position, and $11,000 in backpay.

Defendants answered the Complaint and also moved to dismiss Acosta's claim of racial harassment/hostile work environment as well as all claims against the individual Defendants. By Order of July 17, 2014, this Court scheduled a Rule 16 conference and oral argument on the motion for August 13, 2014. Because Acosta failed to timely respond to the partial motion to

[10] Although the Complaint alleges Acosta was terminated on October 30, 2012, Acosta agrees he was in fact terminated on October 31, 2012. *See* Acosta Dep. 123-24 (agreeing his employment was terminated on Halloween); *see also* Defs.' Partial Mot. to Dismiss Ex. 2, ECF No. 7-2 (EEOC charge alleging an October 31, 2012, termination date); Am. Compl., ECF No. 15 (letter amendment to Complaint alleging an October 31, 2012, termination date).

dismiss, the Court directed Acosta to file a response in advance of the argument. Acosta did not comply with the July 17 Order in any respect, and, when Acosta failed to appear in court on August 13, Defendants made an oral motion to dismiss the case as a sanction. In lieu of granting Defendants' oral motion, on August 14, 2014, the Court issued a further Order directing Acosta to show cause in writing why the case should not be dismissed with prejudice based on Acosta's failure to comply with the July 17 Order and/or for failure to prosecute. The Court also granted Defendants' partial motion to dismiss, dismissing the claims against Huey, Santerelli, and Yocum with prejudice[11] and the hostile work environment claim without prejudice.

Acosta responded to the show cause Order with two letters in which he explained his failure to comply with the July 17 Order was a result of his lack of familiarity with civil litigation and expressed his desire to proceed with his case. On August 27, 2014, this Court issued a further Order permitting Acosta to proceed with this action against East Penn, granting Acosta until September 12, 2014, to file an amended complaint correcting the deficiencies in his hostile work environment claim, and cautioning that failure to comply with the Court's Orders could result in dismissal of his case.

Acosta thereafter submitted a one-page letter stating he wished to pursue a hostile work environment claim against East Penn and correcting his Complaint to read as follows:

> I was hired in May 2012 under the title of Glassmat operator. I began my training on first shift, but was hired for second shift. During my training, I had to switch trainers, because I was being trained incorrectly. Around late August/early September, I complained to Jeff Santer[e]lli and Jason Huey about racial remarks and hostile work environment. Jason Huey was moved and Jeff Santerelli corrected the behavior, and no further racial remarks and harassment continued. On October 31, 2012, I was terminated. I claim I was terminated because I reported a hostile work environment, and racial remarks.

---

[11] As explained in the August 14, 2014, Order, individual employees cannot be held liable under Title VII. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996).

Am. Compl., ECF No. 15.[12]

After a period of discovery,[13] East Penn filed the instant motion for summary judgment on February 24, 2015. Acosta did not respond to the motion by the March 10, 2015, deadline in the Court's scheduling order. Following a teleconference with the parties on March 17, 2015, this Court directed the Clerk of Court to mail a copy of the summary judgment motion to Acosta, who claimed not to have received it, and directed Acosta to submit a response to the motion and any materials he wanted the Court to consider in deciding the motion by April 6, 2015. The Order explained that in ruling on the summary judgment motion, the Court would accept as true all factual assertions in East Penn's affidavits or other documentary evidence and any facts set forth in East Penn's statement of undisputed facts, unless Acosta submitted his own affidavits or other documentary evidence contradicting the assertions.[14] In response to the Court's Order,

---

[12] Following the filing of this amendment, East Penn again moved to dismiss the hostile work environment claim as inadequately pleaded. The Court agrees Acosta's allegation that he complained to supervisors about unspecified "racial remarks and hostile work environment" is insufficient to state a plausible hostile work environment claim, and East Penn's renewed partial motion to dismiss will therefore be granted. As discussed below, Acosta has also failed to produce evidence from which a reasonable jury could find Acosta was subjected to a hostile work environment; hence, in the alternative, the Court will grant summary judgment in favor of East Penn as to Acosta's hostile work environment claim.

[13] During discovery, Acosta failed to respond to East Penn's interrogatories and document requests and canceled his deposition two hours before it was scheduled to occur, prompting East Penn to seek relief from the Court. Although Acosta eventually sat for a deposition on December 30, 2014, and provided interrogatory responses, he never produced initial disclosures or responded to East Penn's document requests. *See* Def.'s Statement of Material Facts ¶¶ 11-12.

[14] The Order also referred the parties to United States Magistrate Judge Marilyn Heffley for a settlement conference. Although a settlement conference was scheduled for July 28, 2015, the conference was canceled after East Penn advised the Court settlement was not a real possibility.

Acosta submitted a letter and three pieces of evidence, all pertaining to his employment at Ashley Furniture, where he worked prior to obtaining a job at East Penn.[15]

**DISCUSSION**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, the defendant is the moving party, the defendant must "show that the plaintiff has failed to establish one or more essential elements of [his] case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* (alteration in original) (citation and internal quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (holding a party opposing summary judgment "must

[15] Acosta's evidence consists of (1) written complaints Acosta submitted to Ashley on August 9, 2011, concerning his and other employees' treatment there, (2) a handwritten chart that appears to relate to one of these complaints, and (3) the first page of the docket for a disorderly conduct case against Acosta from 2011. In the letter accompanying his submission, Acosta states this evidence "is proof that Ashley's furniture ignores complaints by employees and allows abuse," and that both Ashley and East Penn "think that they are above the law and violate civil rights and manipulate documents to their advantage." Pl.'s Exs., ECF No. 30.

do more than simply show that there is some metaphysical doubt as to the material facts"; he must "come forward with specific facts showing that there is a *genuine issue for trial*" (citations and internal quotation marks omitted)).

Workplace harassment based on a characteristic protected by Title VII violates the statute when the harassment is "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive work environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (alteration in original) (citation and internal quotation marks omitted). To prevail on a hostile work environment claim, a plaintiff must establish (1) he suffered intentional discrimination because of a protected characteristic, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would have detrimentally affected a reasonable person in like circumstances, and (5) a basis for respondeat superior liability. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). In determining whether the conduct at issue was sufficiently extreme to amount to a change in the conditions of employment, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Acosta's hostile work environment claim appears to be based primarily on the racial remarks and workplace bullying he endured during his tenure at East Penn. Acosta also alleges he had to switch trainers because he was not being trained correctly. At his deposition, Acosta identified three racial remarks, all made by LaFaver in the July-August 2012 time frame: (1) a statement, in response to a question from Acosta about a scar on LaFaver's neck, that a "bunch

of Puerto Ricans" had slit his throat; (2) the comment, during a discussion about an East Penn employee who had been stabbed on the premises, "I bet it was a bunch of Puerto Ricans that did it"; and (3) a remark that the problem with Reading was there were so many Puerto Ricans. *See* Acosta Dep. 75-80. As to workplace bullying, Acosta testified Yocum spread rumors about Acosta's juvenile conviction. Finally, as to training, Acosta testified he initially trained with Denise Reinert, but eventually switched to Duane Jenne because Reinert was not training him properly.

As an initial matter, there is no evidence Yocum's workplace bullying or Reinert's poor training was attributable to Acosta's race, as required to satisfy the first prong of the hostile work environment test. *See Jensen v. Potter*, 435 F.3d 444, 449-50 (3d Cir. 2006) (noting the first step in the hostile work environment analysis is "to identify what harassment, if any, a reasonable jury could link to a [discriminatory] animus"), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Acosta offers no evidence Yocum's disclosure of his juvenile record (assuming Yocum made such disclosure)[16] had anything to do with his race. And at his deposition, Acosta denied Reinert's improper training was racially motivated. *See* Acosta Dep. 132 ("I never said anything about . . . Denise being racist towards me.").[17]

---

[16] The only evidence Yocum spread information about Acosta's juvenile record is hearsay: Acosta's own testimony that Oscar Justinano, a coworker, told Acosta two or three other unnamed coworkers had told Justinano they had learned of the conviction. *See* Acosta Dep. 100. Yocum maintains he did not even learn about Acosta's conviction until after Acosta was deposed in this case in December 2014, more than two years after Acosta's employment with East Penn was terminated. *See* Yocum Aff. ¶ 14. Acosta has presented no evidence from anyone at East Penn who was aware of the juvenile conviction during Acosta's employment with the company.

[17] Indeed, it is not even clear whether LaFaver's comments were attributable to Acosta's race. While the comments are indicative of animus toward Puerto Ricans, Acosta conceded LaFaver "might not see [him] as Puerto Rican." *See* Acosta Dep. 151; *cf. Caver*, 420 F.3d at 263 (holding

Moreover, the conduct identified by Acosta does not rise to the level of an actionable hostile work environment. LaFaver's comments, while offensive and entirely inappropriate, were not frequent, severe, or physically threatening, and Acosta has not shown how the comments interfered with his work performance. Mindful that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment," *Faragher*, 524 U.S. at 788 (internal citation and quotation marks omitted), the Court concludes the conduct Acosta challenges is not sufficiently severe or pervasive to establish a hostile work environment. *See Henson v. U.S. Foodservice, Inc.*, 588 F. App'x 121, 127 (3d Cir. 2014) (holding a coworker's racial jokes and comments during lunch breaks "were insufficient to create a hostile work environment," where the plaintiff failed to show the comments "were so severe and pervasive that a reasonable person in his position would believe that the conditions of his employment were altered"); *Huggins v. Coatesville Area Sch. Dist.*, 452 F. App'x 122, 127 (3d Cir. 2011) (holding two racially discriminatory comments were insufficient to create an atmosphere of harassment).

In addition, Acosta has failed to produce evidence from which a reasonable jury could find a basis for respondeat superior liability. Where, as here, the harassment giving rise to an allegedly hostile work environment is perpetrated by coworkers, as opposed to supervisors,[18] "the plaintiff must prove employer liability using traditional agency principles." *Andreoli v.*

---

a plaintiff could not "meet the first element of the hostile work environment claim . . . *solely* by pointing to comments that were directed at other individuals" because he could not show the comments would not have been made "but for *his* race if [he] was neither on the receiving end nor the subject of any comments").

[18] Although Acosta alleges Yocum, a supervisor, engaged in workplace bullying by spreading rumors about Acosta's juvenile conviction, as noted, he fails to offer admissible evidence to support the assertion that Yocum told anyone about the conviction, and offers no evidence that Yocum's conduct was attributable to Acosta's race.

*Gates*, 482 F.3d 641, 648 (3d Cir. 2007) (citation omitted). For East Penn to be liable, Acosta must show "that management knew or should have known about the harassment, but failed to take prompt and adequate remedial action." *Id.* (citation omitted).

It is undisputed that East Penn's response to Acosta's complaints about LaFaver was prompt. Acosta concedes as soon as he told Santerelli and Huey that LaFaver was making inappropriate comments, Huey told Santerelli to correct the behavior, and Santerelli immediately met with the employees in the glass mat department and told them to "knock it off," or words to that effect. *See* Acosta Dep. 86, 93-95. It is also undisputed that after the meeting, neither LaFaver nor anyone else made any negative comments about Puerto Ricans or African Americans.[19] *See id.* at 96-97. Thus, insofar as Acosta challenges the adequacy of Santerelli's response based on his assertion that Santerelli was winking while delivering his message, because Acosta admits Santerelli's response stopped the harassment Acosta was experiencing, this challenge is foreclosed as a matter of law. *See Andreoli*, 482 F.3d at 644 n.2 ("A remedial action that stops the harassment is adequate as a matter of law.").

As to Acosta's retaliation claim, in the absence of direct evidence of retaliation, such claims are analyzed under the *McDonnell Douglas* burden-shifting framework. Under this framework, the plaintiff must first establish a prima facie case of retaliation by showing (1) he "engaged in protected activity"; (2) "adverse action by the employer either after or contemporaneous with the employee's protected activity"; and (3) "a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (citation omitted). If the plaintiff makes out a prima

[19] Acosta has not produced any evidence LaFaver or anyone else made negative comments about African Americans at any time before Acosta complained to LaFaver.

facie case, the burden of production shifts to the employer to present "a legitimate, non-retaliatory reason for having taken the adverse action." *Id.* If the employer satisfies its burden at the second step of the analysis, "the burden shifts back to the plaintiff to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (citation and internal quotation marks omitted).

Acosta's claim fails at the first and third steps of the *McDonnell Douglas* analysis. As to the first step, Acosta has failed to establish a prima facie case of retaliation because there is no evidence from which a reasonable jury could find either that Acosta engaged in protected activity or that Acosta's termination was causally related to any alleged protected activity. As to the third step, Acosta has failed to point to evidence from which a jury could find the reasons East Penn offered for terminating Acosta's employment were merely a pretext for discrimination.

"Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory processes or who otherwise oppose employment practices made illegal by Title VII." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 134 (3d Cir. 2006). Protected opposition conduct is not limited to the formal filing of charges with the EEOC, but also includes "informal protests of discriminatory employment practices, including making complaints to management." *Id.* at 135 (citation omitted). To qualify as protected, however, the conduct must bear "some perceptible connection to the employer's alleged illegal employment practice." *Id.* "A general complaint of unfair treatment is insufficient to establish protected activity," *id.*; rather, the plaintiff must convey opposition "to discrimination based on a protected category, such as . . . race," *Daniels*, 776 F.3d at 193; *see also Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).

By Acosta's own account, his complaints to Santerelli and Huey concerned "inappropriate comments" by LaFaver. *See* Acosta Dep. 82 ("I told him he's been saying inappropriate comments."); *id.* at 85 ("I said, well, Barry, he's saying inappropriate comments and stuff like that."); *id.* at 86 ("I told them, I said he's been saying inappropriate stuff."). When asked at his deposition when he first complained about LaFaver's comments about Puerto Ricans, Acosta responded, "I didn't complain about that," clarifying he "told Jason Huey about inappropriate comments," but "didn't get into details." *Id.* at 81; *see also id.* at 141 ("I reported workplace bullying and racial remarks to Jason Huey and—*I said inappropriate comments*." (emphasis added)). There is no evidence Acosta gave Santerelli and Huey any reason to believe LaFaver's comments concerned race, color, national origin, or any other category protected by Title VII; therefore, Acosta has failed to show there is a genuine issue for trial as to whether he engaged in protected conduct. *See Barber*, 68 F.3d at 701-02 (holding an employee's letter "complain[ing] about unfair treatment in general and express[ing] his dissatisfaction with the fact that someone else was awarded the position" was not protected conduct under the Age Discrimination in Employment Act because the letter did not "explicitly or implicitly allege that age was the reason for the alleged unfairness").

"To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if unusually suggestive," *Daniels*, 776 F.3d at 196 (citation and internal quotation marks omitted), but the approximately two-month period between Acosta's complaints and his termination does not satisfy this standard, *see Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 & n.4 (3d Cir. 2004) (holding the passage of approximately two months between a plaintiff's protected activity and his termination was "not so close as to be unduly suggestive" and suggesting even a one-month time period

would not qualify as unduly suggestive (citation omitted)). Acosta must therefore point to other evidence suggestive of retaliatory animus, such as "any intervening antagonism by the employer" or "inconsistences in the reasons the employer gives for its adverse action." *Daniels*, 776 F.3d at 196. He has not done so.

Acosta offers no evidence of intervening antagonism after he complained to Santerelli and Huey, and he identifies no inconsistencies in the reasons given for his termination. Moreover, while Acosta maintains East Penn's reasons for firing him were "not legit," Acosta Dep. 150, he has failed to meaningfully rebut East Penn's evidence regarding his performance problems. For example, Acosta admits he engaged in horseplay during work hours and made errors with respect to work orders or manifests. He also admits product created on his watch had to be scrapped. Although Acosta denies responsibility for the scrapped product, faulting instead a department-wide change in work method, there is no evidence any other employee in Acosta's department had similar problems with the new work method. In fact, the only evidence points to the contrary. *See* Santerelli Aff. ¶ 10 ("None of Acosta's co-workers in the Glass Mat Department had anywhere near the level of scrap separator material that Acosta was producing."). At his deposition, Acosta claimed Santerelli had told him privately at some point that he was "doing good," Acosta Dep. 125, but this lone statement does not call into question Acosta's documented history of performance problems, many of which Acosta himself concedes.[20] On this record, no reasonable jury could conclude Acosta's complaints about LaFaver were causally related to his termination two months later.

---

[20] Acosta also testified he believed his supervisors' criticisms of his performance were invalid because the supervisors relied on feedback from Acosta's coworkers. As noted, however, Acosta admits much of the underlying conduct for which he was criticized. Moreover, while Acosta maintains one of the coworkers who complained about him (LaFaver) "has unresolved . . . issues towards Hispanic or Puerto Rican people," Acosta Dep. 79, he makes no similar allegations of

Finally, even assuming Acosta could establish a prima facie case of retaliation, summary judgment is nevertheless warranted because East Penn has proffered a legitimate, nonretaliatory reason for terminating his employment—his poor work performance—which Acosta has failed to rebut. Once an employer has articulated a legitimate reason for an adverse action, to avoid summary judgment, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a . . . determinative cause of the employer's action." *Daniels*, 776 F.3d at 198-99 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (alteration in original). For the reasons discussed above, Acosta has failed to do so here.

As set forth above, the evidence in the summary judgment record, even when viewed in the light most favorable to Acosta, would not permit a reasonable jury to find in his favor on either his hostile work environment claim or his retaliation claim. Accordingly, East Penn's motion for summary judgment will be granted.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.

---

bias about any of the other coworkers who provided negative feedback, *see* Thomas Aff. ¶ 4 (identifying Acosta's trainers (i.e., Reinert and Jenne) as the source of negative feedback about his first-shift performance); Santerelli Aff. ¶ 8 (describing complaints received from multiple second-shift coworkers).